# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| REV. A. OFFORD CARMICHAEL, JR., REV. DIANE CONLEY,<br><br>*Individually, And On Behalf of Themselves and All Others Similarly Situated,*<br><br>Plaintiffs,<br><br>v.<br><br>REV. DR. JEROME V. HARRIS, AFRICAN METHODIST EPISCOPAL CHURCH, AFRICAN METHODIST EPISCOPAL CHURCH MINISTERIAL RETIREMENT ANNUITY PLAN, AND JOHN DOES 1-10,<br><br>Defendants. | **Case No. 1:22-cv-386**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Reverend A. Offord Carmichael, Jr. and Reverend Diane Conley, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Reverend Dr. Jerome Harris, African Methodist Episcopal Church ("AMEC"), and African Methodist Episcopal Church Ministerial Retirement and Annuity Plan, and allege the following:

## INTRODUCTION

1.      This suit arises out of the breaches of fiduciary duty and negligent acts and omissions of the Defendants in managing the AMEC Pension Fund (the "Fund") and retirement assets of the below-defined Class. This suit also is brought in the alternative under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. This class action seeks recovery on behalf of AMEC ministers and other employees who, collectively, have lost tens of millions of dollars in career retirement savings due to Defendants' misconduct and mismanagement of the Fund.

2.      Plaintiffs and the members of the class (collectively, "Plaintiffs") are ministers, bishops, officers, elders, and other employees (and their respective beneficiaries) of AMEC or AMEC-related institutions or programs who have: (i) lost money that was (or should have been) invested in the Fund or had diminished investment returns because of mismanagement of the Fund.

3.      Pursuant to the terms of the Plaintiffs' employment, AMEC paid a percentage of the Plaintiffs' income to the Fund.

4.      As detailed below, Defendants directly owed duties to Plaintiffs and the putative class members, including fiduciary duties, to conduct due diligence, monitor investments, and oversee and audit the Fund and its trustee(s) or managers, in order to assure that that the Fund was protected and that plan participants and their beneficiaries had access to their

retirement funds when it came time for appropriate payments or withdrawals. At all times relevant, the Defendants had the power to monitor, review, dismiss, appoint, and control the operations of various trustee(s) whose responsibility was to act in the best interests of the plan participants. Moreover, if ERISA applies to Plaintiffs' claims, it imposes, among other requirements, fiduciary standards drawn from the law of trusts, and ERISA fiduciaries are bound to act with an "eye single" to the interest of the plan participants and the beneficiaries to whom they owe a duty. *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1402 (9th Cir. 1995) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982)). Regardless of whether ERISA applies to this plan, these duties existed under common law and in these circumstances, due in part to Defendants' representations that the Plan was subject to ERISA.

5.     Defendants oversaw and controlled the investments in the Fund and did not adequately monitor or oversee the Fund. The Defendants in this action are each responsible for the Fund's massive losses.

6.     The loss of assets and other mismanagement of the Fund is a direct and proximate result of Defendants' failure to fulfill their duties to Plaintiff and the putative class.

## PARTIES

7.      Plaintiff Reverend A. Offord Carmichael is a resident of Graham, Alamance County, North Carolina. Reverend Carmichael has served as an AMEC minister for approximately forty-eight years, and currently serves as an itinerant elder, the highest ministerial order within the church. Reverend Carmichael plans to retire within the next two years, after fifty years of service to the church. At all times relevant herein, Reverend Carmichael has been a Fund contributor and participant in the Plan.

8.      Plaintiff Reverend Diane Conley is a resident of Morganton, Burke County, North Carolina. Reverend Conley began her pastoral service in the church as a supply pastor in 1992. She was ordained as a deacon in 1994, and has been an itinerant elder, the highest ministerial order in the church, since 1996. At all times relevant herein, Reverend Conley has been a Fund contributor and participant in the Plan.

9.      Defendant Reverend Dr. Jerome V. Harris is a citizen and resident of Memphis, Tennessee, in Shelby County, and he served as the Executive Director of the AMEC Department of Retirement Services until June 2021. Defendants gave Reverend Harris almost unfettered authority to invest tens of millions of dollars, which he did in numerous disloyal and negligent ways, including in a questionable and potentially unlawful purchase of undeveloped land in Florida and a now non-existent capital venture outfit. To the extent

ERISA applies to Plaintiffs' claims, Dr. Harris was a named fiduciary of the Plan by reason of being a Trustee within the meaning of ERISA Section 402(a)(2), 29 U.S.C. § 1102(a)(2). Dr. Harris was further a Plan fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21)(A), in that he had and exercised discretionary authority and control over Plan management and had and exercised authority and control over the disposition of the Plan's assets.

10.     Defendant AMEC, including its Department of Retirement Services, which oversees the Fund, is a corporation organized under the laws of Pennsylvania as a not-for-profit 501(c)(3) corporation. AMEC's principal place of business is in Nashville, Tennessee. The AMEC Department of Retirement Services maintains its principal place of business in Memphis, Tennessee. AMEC is the "Administrator" of the Plan as defined in the Plan's Summary Plan Description and within the meaning of 29 U.S.C. § 1002(16)(A)(i).

11.     Defendant African Methodist Episcopal Church Ministerial Retirement Annuity Plan (the "Plan") is an employee pension benefit plan, and is headquartered in Nashville, Tennessee. The Plan is an "employee pension benefit plan" within the meaning of ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A).

12.     Defendants John Does 1-10 are affiliates or subsidiaries of

Defendants that may be responsible for the conduct alleged herein. Such parties are named in a "John Doe" capacity pending further discovery in this case.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C §§ 1331, 1332(d), and 1367(a), and 29 U.S.C. § 1132(e)(1). The amount in controversy exceeds $5,000,000, and there are members of the proposed Class who are citizens of a State different from the State of citizenship of at least one of the Defendants.

14.     This Court may exercise personal jurisdiction over Defendants because Defendants conduct substantial business in this State, including conducting Fund business within this State, and have engaged in the unlawful practices described herein in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 29 U.S.C. §1132(e)(2) because the Plan is administered in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, Defendants do business in and/or can be found in this District, and Defendants are subject to the court's personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

**I.    History of the AMEC**

16.    The African Methodist Episcopal ("AME") denomination grew out of the Free African Society, which was established in Philadelphia in 1787.

17.    The first member church of AMEC was dedicated in Bethel, Pennsylvania in 1794, and Richard Allen (a founding member of the Free African Society) was made pastor.

18.    Allen successfully sued in the Pennsylvania courts in 1807 and 1815 for the right of his congregation to exist as an independent institution.

19.    In light of the fact that other Black Methodists in middle Atlantic communities also encountered racism and desired religious autonomy, they met in Philadelphia to form a new Wesleyan denomination, the AME.

20.    Prior to the Civil War, the geographical spread of the AMEC was mostly in the Northeast and Midwest, with major congregations established in Philadelphia, New York, Boston, Pittsburgh, Baltimore, Washington, DC, Cincinnati, Chicago, Detroit, and other large cities.

21.    The AMEC eventually reached the Pacific Coast in the early 1950's, establishing churches in various cities across California.

22.    During the Civil War and Reconstruction, AMEC membership boomed as AME clergy moved into the states of the collapsing Confederacy. By 1880, membership reached 400,000 because of AMEC's rapid spread in the

South.

23.     Today, AMEC has members in 20 Episcopal Districts in 39 countries on 5 continents. The work of the Church is administered by 21 active bishops and nine General Officers who manage departments of the Church.

## II.     AMEC Fund Allegations

24.     Beginning in the mid-1960s, AMEC provided a retirement plan for its eligible employees. The plan required AMEC's ministers, bishops, officers, elders, and other employees of AMEC or AMEC-related educational institutions or programs to enroll.

25.     Over a period of decades, the plan evolved, but by January 1, 2003, AMEC had created another plan, a 401(k) plan for eligible employees who wished to contribute to their retirement in this form of investment savings. To contribute, eligible employees reduced their earned compensation and directed their earnings to the 401(k) plan.

26.     Upon information and belief, AMEC consolidated the various governing documents of its historical plan into one organized retirement investment plan document. The resultant retirement plan is believed to be currently named the "African Methodist Episcopal Church Ministerial Retirement Annuity Plan." This combined retirement plan is the operative Plan at issue in this case.

27.     Upon information and belief, the Plan is inclusive of all salaried

employees of AMEC, except for "Excluded Employees," as defined in the Plan.

28. The only known Plan Document and Summary Plan Description, as well as other written communications to the Church's clergy and employees, all state that the Plan is an ERISA plan and therefore is to be operated in full compliance with ERISA. However, whether the Plan is actually subject to ERISA is unknown at this time, and therefore Plaintiffs assert alternative claims for relief under both the common law and under ERISA.

29. In any event, because of the Defendants' representations, the Defendants are bound to operate the Plan in accordance with ERISA's requirements, even if a claim cannot be brought directly under ERISA. In other words, regardless of whether ERISA actually applies, Defendants are fiduciaries and parties-in-interest of the Plan within the meaning of ERISA, and are required to act with the utmost prudence and solely in the interest of the Plan's participants when making decisions with respect to Plan management and investments.

30. Defendants breached their common law fiduciary duties, as well as their fiduciary duties under ERISA, to Plaintiffs with respect to their disloyal and imprudent management of the Plan.

III.    **Misappropriation and Mismanagement of the Plan**

31. Since approximately 2002, Defendant Reverend Jerome V. Harris was the person in charge of management of the Plan's assets.

32.    At all times relevant, Defendant Harris acted as Trustee of the Plan, making investment decisions and taking action with the approval and authority of the directors of AMEC and the Plan.

33.    Both AMEC (by and through its representatives), and the third-party administrators, failed to engage in proper oversight over Rev. Harris and his investment decisions. Further, as alleged below, the Plan's third-party administrators failed to ever do a proper audit, as they should have.

34.    Throughout the early 2000s and until the relevant time period, Defendant Harris would routinely publish written materials and present at conferences on the condition of the Plan funds and its investments.

35.    The AME Church established a "General Board" in 1956 to guide the AME Church. The General Board Orientation Handbook, issued for each four-year period between the Church's Quadrennial Sessions, requires (among many other things) the General Board to hire an auditor to conduct an annual audit of the Department, including with respect to the contributions and investments in the Plan.

36.    At the July 2016, 50th Quadrennial Session General Conference of the AME Church, Defendant Harris as Executive Director of the Department of Retirement Resources reported on the status of the Plan. In his presentation, Dr. Harris reported that as of fiscal year end 2015, the Plan had a total value of $113,388,374.50 and as of the fiscal year end 2016 it had grown to

$117,521,777.23.

37.     In 2017, Defendant Harris again reported on the financial condition of the Plan. In so doing, he represented steady and continual growth in Plan assets between 2012 and 2017.

38.     In his overview, Dr. Harris stated that the last twelve months had been a time of turmoil and uncertainty, which had an impact on the financial markets both in the United States and globally. He further stated that it was because of this uncertainty and market instability that the Department "has continued to adhere to a conservative investment strategy which has been in place since 2001. It is a strategy that has resulted in the continuous and consistent growth of the AMEC Ministerial Retirement Annuity Plan portfolio as reflected in the following pages of this report." The report indicated that as of fiscal year end 2017 the Plan portfolio total value was $119,800,961.03. The audit of the Department of Retirement Services for 2016-2017 stated that "Symetra Financial and Retirement Services Company" is the investment company through which Plan annuity investments are purchased. The audit states that "[a]s of March 31, 2017 and 2016, the total account balances of annuities held and invested on behalf of the clergy servants and full time employees of the African Methodist Episcopal Church was $119,801,000 and $117,522,000."

39.     While Defendant Harris' representations often attempted to

reassure Plaintiffs that their funds were being invested in a conservative, protected manner, later disclosures have revealed that AMEC and the third-party administrators it had hired to help oversee and administer the Fund have failed to properly oversee or manage the funds invested by Plaintiffs and the putative Class into the Plan.

40.     More specifically, subsequent communications revealed that of the approximately $120,000,000 in assets invested into the Plan (and/or which were purportedly held in conservative investment funds and portfolios), a substantial portion, and potentially $80,000,000 to $90,000,000, has been unaccounted for and/or inappropriately invested.

41.     Details of imprudent, illogical, and risky investments of Plan assets followed, indicating that AMEC and the Plan management failed to adequately protect the interests of the Plaintiffs and their retirement savings. The recent, backwards-looking audits and interest in investigating the safety of the Plaintiffs' retirement funds has come too late.

42.     For example, on January 31, 2022, a meeting of the General Board confirmed that the Plan had, in fact, lost well over half of its value, and potentially up to two-thirds, with the exact amount unknown.

43.     Defendants' high-risk, speculative, and imprudent investments included investments in Motorskill Ventures, a now-defunct Texas investment firm. Upon information and belief, losses arising from this

investment exceed $80 million.

44.     Another imprudent investment includes investments in undeveloped real estate in Key Marco, Florida.

45.     Defendant Harris' and the AMEC and Plan directors' actions failed to reasonably or reliably protect the interest of the Plaintiffs in their investments.

46.     As alleged above, tens of millions of dollars of the Plaintiffs' retirement funds have been disastrously put into speculative and unsafe investments, and even what was invested in safer investment vehicles generated returns that were woefully below the industry standard. These breaches of fiduciary duty harmed the Plaintiff and the putative class.

47.     Defendant Harris was eventually removed from his position.

## **SPECIFIC ALLEGATIONS**

48.     At all times relevant herein, Plaintiff Reverend Carmichael has been a Fund contributor and Plan participant. As a result of Defendants' acts and omissions, Reverend Carmichael has suffered financial loss. In particular, Reverend Carmichael's most recent account statement for the period April 1, 2021 through June 31, 2021, showed an account balance of $107,989.04. Reverend Carmichael has not received a statement since that time. As of May 19, 2022, however, the online portal that he uses to access his account shows a balance of $32,442.24.

49.    At all times relevant herein, Plaintiff Conley has been a Fund contributor and Plan participant. As a result of Defendants' acts and omissions, Reverend Conley has suffered financial loss. Reverend Conley's most recent account statement for the period April 1, 2021 through June 31, 2021, showed an account balance of $34,251.90. Reverend Conley has not received a statement since that time, but based on publicly available information, including Defendants' disclosures, she reasonably believes that her balance is now substantially less than that amount.

50.    On or about September 14, 2021, Defendant AMEC sent letters from the Fund to Plaintiffs, notifying them and other Plan participants that disbursements would be temporarily paused while the Fund was audited due to a change in leadership. The letter stated that this audit would take 4-6 weeks. The letter also stated, however, that contributions would "still be received" during the audit.

51.    On about November 9, 2021, Defendant AMEC sent a second letter to Plaintiffs stating that the audit was not finished and therefore disbursements could not be made.

52.    In December 2021, at a General Board Meeting, Defendant AMEC's Commission on Retirement Services provided an update on its investigation of financial irregularities related to certain investments managed by AMEC's Department of Retirement Services. In a subsequent

communication to Reverend Carmichael, and, upon information and belief, other Fund participants, Defendant AMEC wrote, "[w]e also want to be clear: this issue impacts every fund participant[.]"

53.     AMEC ministers and employees, like Plaintiffs, have suffered significant financial loss as a result of Defendants' acts and omissions. Further, they are now being told by AMEC that their retirement funds may be as much as 70 percent lower than was represented in June 2021. Even the June 2021 statements likely concealed years of disastrous returns that were far below even conservative rates of return that should have been obtained by the Fund had Defendants been properly adhering to their fiduciary duties they owed Plaintiffs and the putative Class members.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for Defendants' misconduct, as alleged herein.

### A.     Class Definition

55.     Plaintiffs bring this action on behalf of the following class:

All persons residing in the United States who are participants in the African Methodist Episcopal Church Ministerial Retirement Annuity Plan, and all persons residing in the United States who are beneficiaries entitled to benefits under the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.

56. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

57. Plaintiffs are members of the Class they seek to represent.

58. The misconduct challenged herein has been and is continuing in nature.

## B. Rule 23(a) and Rule 23(b)(3) Requirements

### 1. Numerosity

59. There are thousands of members of the proposed Class, who are geographically located throughout the United States.

60. Upon information and belief, there are over 5,000 Plan participants impacted by the factual allegations contained in this Complaint.

61. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Defendants' corporate records.

62. The number of Plaintiffs is so numerous that joinder of all members is impracticable.

63. The identification of Class members is ascertainable through Defendants' maintained records.

### 2. Commonality

64. The prosecution of the claims herein will require the adjudication of numerous questions of law and fact common to the Class. The common

questions of law and fact predominate over any questions affecting only individual Class members. The common questions include:

> a. Whether the Defendants breached their fiduciary duties to the ministers and other AMEC employees that participated in the AMEC's retirement plan;
>
> b. Whether the Defendants were negligent in failing to perform adequate due diligence in relation to the Fund;
>
> c. Whether and to what extent Plaintiffs were damaged by the Defendants' misconduct challenged herein;
>
> d. The appropriate measure of damages to which the Plaintiffs are entitled; and,
>
> e. Whether the Plaintiffs are entitled to an accounting of the Fund.

### 3. Typicality

65. All Class members were subject to the same misconduct as alleged herein, and their injuries and claims arise out of the same wrongdoing.

### 4. Adequacy of Representation

66. Plaintiffs are adequate representatives of the Class.

67. Plaintiffs' interests are coextensive with those of the members of the proposed Class. Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.

68. Plaintiffs have no interests antagonistic to, or in conflict with, the other Class members, and will fairly and adequately protect the interests of the Class.

69.     Plaintiffs have retained counsel highly skilled in complex litigation and who are qualified, experienced, and able to conduct this litigation.

**5.     Predominance & Superiority**

70.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

71.     Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

72.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class.

73.     AMEC has acted on grounds generally applicable to Plaintiffs and the proposed Class by mismanaging the Fund's investments.

74.     AMEC has acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class.

**6.     Injunctive Relief**

75.     Injunctive relief is also sought in this case. Entitlement to injunctive relief flows directly and automatically from Defendants' breach of their fiduciary duty. In turn, entitlement to injunctive relief forms the factual and legal predicate for the monetary and non-monetary remedies for

individual losses caused by Defendants' breaches of fiduciary duty and negligent conduct.

## CLAIMS FOR RELIEF

### COUNT I
### (BREACH OF FIDUCIARY DUTY)
### (On behalf of Plaintiffs and Members of the Class)

76.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-75 as if fully set forth herein.

77.    Plaintiffs brings this claim against all Defendants.

78.    The Defendants had substantial discretion and control over the Plaintiffs' and other Class members' retirement funds (including the investment of such funds) and communications with Plaintiffs and other Class members.

79.    This discretion and control gave rise to fiduciary duties of loyalty and care on the part of each Defendant to Plaintiffs and other Class members. Also, the Defendants represented that the Plan was subject to ERISA, which imposes fiduciary duties on the Defendants, so that even if ERISA does not apply, the Defendants owed the fiduciary duties recognized by ERISA.

80.    The Defendants occupied a superior position over Plaintiffs and other Class members with respect to their management and control over Plaintiffs and other Class members' retirement funds.

81.    The Defendants' superior position necessitated that Plaintiffs and

other Class members repose trust and confidence in the Defendants to fulfill their duties, and Plaintiffs and other Class members reposed such trust by investing in the Funds.

82.     As managers and professional advisors of the Fund, Defendants owed fiduciary duties to the Plaintiffs and other Class members.

83.     The Defendants breached their fiduciary duties to Plaintiffs and other Class members by failing to adequately manage the Fund.

84.     Plaintiffs and other Class members have been damaged as a proximate result of Defendants' breaches of fiduciary duty and are entitled to damages, and appropriate equitable relief, including accounting.

**COUNT II**
**(NEGLIGENCE)**
**<u>(On behalf of Plaintiffs and Members of the Class)</u>**

85.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-75 as if fully set forth herein.

86.     Plaintiffs bring this claim against all Defendants.

87.     The Defendants had a special relationship with Plaintiffs and other Class members that gave rise to a duty to exercise due care in the management of their assets invested in the Fund.

88.     The Defendants knew or should have known that Plaintiffs and other Class members were relying on the Defendants to manage the investments entrusted to the Fund with reasonable care, and Plaintiffs and

other Class members did reasonably and foreseeably rely on the Defendants to exercise such care by entrusting assets to the Fund.

89.    The Defendants failed to exercise due care and thereby injured Plaintiffs and other Class members.

90.    The Defendants failed to exercise the degree of prudence, caution, and good business practice required of persons who obtain and manage retirement funds.

91.    The Defendants also failed to perform adequate due diligence and monitoring with respect to the Fund and its investments.

92.    If the Defendants had not been negligent, they would have discovered that Plaintiffs and other Class members had lost a substantial portion of their retirement funds.

93.    As a proximate and foreseeable result of Defendants' negligence, Plaintiffs and other Class members have been damaged.

94.    By reason of the foregoing, the Defendants are jointly and severally liable to Plaintiffs and other Class members.

## COUNT III
### (IN THE ALTERNATIVE, BREACH OF FIDUCIARY DUTIES FOR FAILING TO PRUDENTLY AND LOYALLY SELECT, RETAIN AND MONITOR PLAN INVESTMENTS IN VIOLATION OF ERISA SECTION 404, 29 U.S.C. § 1104)
### (On Behalf of Plaintiffs and Other Class Members)

95.    Plaintiffs reallege and incorporate by reference the allegations

contained in paragraphs 1-75 as if fully set forth herein.

96.    To the extent ERISA applies to Plaintiffs' claims, Plaintiffs allege this claim in the alternative to the non-ERISA claims in this complaint.

97.    Plaintiffs bring this claim against all Defendants.

98.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection, retention, and monitoring of the Plan's investments.

99.    The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, and eliminating imprudent ones.

100.   As described throughout this Complaint, Defendants abandoned their fiduciary duties with respect to administration of the Plan, including the selection and monitoring of Plan investments and instead permitted a single fiduciary, Defendant Harris, to make all investment decisions for the Plan. This misconduct – Defendants' indifference to Plan assets and retirement Plan participants' retirement savings – resulted in Defendant Harris' high-risk, speculative investments and to the loss of most or all of the Plan assets placed

in these investments.

101.   Through these failures to manage and administer the Plan and its assets, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their fiduciary duty of loyalty under 29 U.S.C.§ 1104(a)(1)(A).

102.   Through their actions and inactions, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

103.   As a direct and proximate result of the above breaches of fiduciary duties, the Plan participants have suffered a minimum of tens of millions of dollars of losses in retirement assets. Pursuant to ERISA, Defendants are liable to restore all losses suffered by the Plan and its participants and beneficiaries caused by the breaches of fiduciary duty. 29 U.S.C. §§ 1109(a), 1132(a)(2) and 1132(a)(3).

## COUNT IV
## (IN THE ALTERNATIVE, BREACHES OF FIDUCIARY DUTY FOR
## FAILURE TO MONITOR APPOINTED FIDUCIARIES)
## (On Behalf of Plaintiffs and Other Class Members)

104. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-75 as if fully set forth herein.

105. To the extent ERISA applies to Plaintiffs' claims, Plaintiffs allege this claim in the alternative to the non-ERISA claims in this complaint.

106. Plaintiffs bring this claim against all Defendants.

107. As described throughout this Complaint, Defendants were named fiduciaries pursuant to ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. As such, they were bound by the duties of loyalty, exclusive purpose, and prudence.

108. The scope of the fiduciary responsibilities of Defendants included the responsibility to appoint, remove, and monitor the performance of other fiduciaries.

109. Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

110. The monitoring duty further requires that appointing fiduciaries

have procedures in place so that they may review and evaluate, on an ongoing basis, whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

111.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with the complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

112.    An appointing and monitoring fiduciary also has the express power and inherent obligation to remove fiduciaries who are failing to abide by the requirements of ERISA in the performance of their duties.

113.    Defendants breached their fiduciary monitoring duties by, among other things, (1) failing to inquire or ask questions of the sole fiduciary making all investment decisions for the Plan, Defendant Harris, (2) failing to obtain

reports from the Trustees concerning management of the Plan and (3) failing to remove Harris for their own fiduciary breaches.

## COUNT V
## (IN THE ALTERNATIVE, CLAIM FOR CO-FIDUCIARY BREACHES IN VIOLATION OF ERISA SECTION 405(A), 29 U.S.C. § 1105(A)) (On Behalf of Plaintiffs and Other Class Members)

114.   Plaintiffs realleges and incorporates by reference the allegations contained in paragraphs 1-75 as if fully set forth herein.

115.   To the extent ERISA applies to Plaintiffs' claims, Plaintiffs allege this claim in the alternative to the non-ERISA claims in this complaint

116.   Plaintiffs bring this claim against all Defendants.

117.   In addition to liability under any other provision of ERISA, Section 405(a) imposes liability on a fiduciary for breach of a fiduciary responsibility of another fiduciary of the same plan if a fiduciary: (1) knowingly participates in or knowingly conceals another fiduciary's breaches; (2) through a failure to comply with his or her own fiduciary responsibilities, has enabled the other fiduciary's breaches; or (3) if he or she has knowledge of another fiduciary's breaches and makes no reasonable efforts under the circumstances to remedy those breaches. 29 U.S.C. § 1105(a).

118. As fiduciaries with respect to the Plan, Defendants have separately and jointly violated their duties as co-fiduciaries through, among other things:

119. Their complete abdication of their own fiduciary duties with respect to Plan management, which enabled Defendant Harris to make imprudent Plan investments and to lose the majority of Plan assets.

120. Their failure to take any action to remedy obvious fiduciary breaches, despite their obvious knowledge of breaches by their co-fiduciaries' breaches, such as the failure by Defendant Harris and other fiduciaries to follow Plan documents, to review and report on Plan investments, and to abide by ERISA's reporting and disclosure requirements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class pray the Court for the following relief:

1. That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. That the Court name Plaintiffs as Class Representatives and their counsel as Class Counsel;

3. That the Court enter an order finding that Defendants' conduct was a breach of their fiduciary duties;

4. That the Court enter an order finding that that Defendants' conduct was negligent as alleged herein;

5. That the Court enter an order finding that Defendants are liable on the other grounds alleged herein, including for violation of ERISA (in the

alternative to the common law claims);

6.     That the Court award Plaintiffs and the other Class members damages and injunctive relief as appropriate, including but not limited to an accounting;

7.     That the Court award Plaintiffs and the other Class members pre-judgment and post-judgment interest;

8.     That the Court award Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses;

9.     That all costs of this action be taxed against Defendants; and

10.    That the Court award Plaintiffs and the Class such other and further relief as this Court may deem just and proper.

11.    Plaintiffs demand a trial by jury.

12.    Plaintiffs reserve the right to amend the Complaint.

Dated: May 19, 2022.          Respectfully Submitted,

                              **BLUE LLP**

                              /s/ *Dhamian A. Blue*
                              Dhamian A. Blue
                              N.C. Bar No. 31405
                              Daniel T. Blue, Jr.
                              N.C. Bar No. 5510
                              205 Fayetteville Street, Suite 300
                              Raleigh, NC 27601
                              T: (919) 833-1931
                              F: (919) 833-8009
                              *Attorney for Plaintiffs*